[Cite as *In re M.H.*, 2021-Ohio-1041.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: M.H., a minor child. | : | APPEAL NOS. C-190692 |
| | | C-190693 |
| | : | C-190717 |
| | | C-190718 |
| | | TRIAL NOS. 18-6077x |
| | : | 18-6078x |
| | | 18-6079x |
| | : | 18-6080x |
| | | |
| | : | *O P I N I O N.* |

Appeals From: Hamilton County Juvenile Court

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: March 31, 2021

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Ronald Springman*, Assistant Prosecuting Attorney, for Appellee State of Ohio,

*Raymond T. Faller*, Hamilton County Public Defender, and *Jessica Moss*, Assistant Public Defender, for Appellant M.H.

CROUSE, Judge.

{¶1} In these consolidated appeals, appellant M.H. challenges her adjudications of delinquency by the Hamilton County Juvenile Court. The appeal numbered C-190692 involves an adjudication of delinquency for conduct that, if it had been engaged in by an adult, would have constituted the offense of obstruction of official business. The appeal numbered C-190693 involves an adjudication of delinquency for conduct that, if it had been engaged in by an adult, would have constituted the offense of resisting arrest. And the appeals numbered C-190717 and C-190718 involve adjudications of delinquency for conduct that, if it had been engaged in by an adult, would have constituted two offenses of assault on a peace officer. For the reasons set forth below, we affirm the judgments of the juvenile court.

### I. Facts and Procedure

{¶2} On December 11, 2018, Mount Healthy Police Officers Jordan Rubariu and Colin Higgins received a dispatch for "physical trouble with a customer who was refusing to leave [the Family Dollar]." The dispatch provided that "unruly juveniles" were in the store and that one of the juveniles had thrown candy at the store clerk. According to the dispatch, the juvenile was "a female black wearing a white coat and a red hat."

{¶3} Minutes after the dispatch, Rubariu and Higgins saw M.H. walking with two other individuals approximately 100 yards away from the Family Dollar. M.H. matched the description of the alleged assailant. The officers activated their body-worn cameras and the overhead lights of their patrol vehicle.

{¶4} Higgins testified that Rubariu exited from the patrol vehicle and twice ordered M.H. to "come here." Footage from Higgins's body cam shows M.H.

2

standing on the sidewalk, facing Rubariu. M.H. asked Rubariu, "What's the problem?" and Rubariu immediately grabbed her wrist. M.H. then pulled her arm away from Rubariu and twisted her body in an attempt to break free. In response, Rubariu performed a takedown maneuver on M.H. While on the ground, M.H. nestled her hands underneath her body and started kicking her legs to avoid the impending arrest. Rubariu laid his body on top of M.H. to immobilize her and handcuff her. Higgins grabbed M.H.'s ankles to prevent her from kicking Rubariu.

{¶5} Officer Timothy Baird initially responded to the Family Dollar to investigate the alleged assault. While Baird was making the initial police report, Rubariu put out an assistance call. Baird immediately left the Family Dollar and responded to the scene to assist Rubariu. When Baird arrived, Rubariu was lying on top of M.H. and Higgins was holding her ankles. After Rubariu successfully handcuffed M.H., the three officers carried her to the patrol vehicle—Rubariu holding her hands, Baird holding her arm and shoulder, and Higgins holding her ankles. M.H. resisted, kicking her legs backwards and hitting Higgins in the groin. Higgins was not injured.

{¶6} M.H. continued to resist as the officers forced her into the backseat of the patrol vehicle. The officers attempted to restrain M.H. through the use of a hobble. As another responding officer, Alan Fath, was placing the hobble on M.H.'s legs, she kicked Baird in the arm. Baird's arm collided with his body-worn camera and displaced the camera, but Baird was not injured. Eventually, M.H. was secured in the back of the patrol vehicle and transported to the police department.

{¶7} On December 11, 2018, the state filed several complaints to have M.H. adjudicated delinquent for three counts of assault on a peace officer, one count of resisting arrest, and one count of obstructing official business. M.H. filed a motion

3

to suppress any evidence obtained as a result of what she alleged was an unconstitutional use of excessive force. On July 30, 2019, the magistrate conducted a suppression hearing. Based on the testimony of Officers Higgins and Baird, the magistrate denied M.H.'s motion. Immediately thereafter, the magistrate proceeded to trial on all counts. The magistrate heard testimony from Officers Higgins, Baird, and Fath. At the close of trial, the magistrate adjudicated M.H. delinquent for obstructing official business, resisting arrest, and two counts of assault on a peace officer.[1] Following objections from M.H., the juvenile court adopted the magistrate's decisions. M.H. appealed, raising the following four assignments of error for our review:

1. The trial court erred when it denied M.H.'s motion to suppress.

2. The trial court erred in adjudicating M.H. delinquent when the evidence was insufficient as a matter of law to support the adjudications.

3. The trial court committed numerous errors that violated M.H.'s right to due process and a fair trial.

4. The juvenile court erred in adjudicating M.H. delinquent for obstruction of official business, resisting arrest, and assault on a peace officer where the adjudications were against the manifest weight of the evidence.

---

[1] One count of assault on a peace officer was dismissed for want of prosecution due to Officer Rubariu's failure to appear at trial.

## II. Motion to Suppress

{¶8} In her first assignment of error, M.H. argues that the juvenile court erred in denying her motion to suppress. The motion to suppress centered on the alleged use of excessive force by the arresting officer, Rubariu.

{¶9} A motion to suppress is a "[d]evice used to eliminate from the trial of a criminal case evidence which has been secured illegally[.]" *Hilliard v. Elfrink*, 77 Ohio St.3d 155, 158, 672 N.E.2d 166 (1996). A motion to suppress can raise only matters that are capable of determination without a trial of the general issue. Crim.R. 12(C).

{¶10} In this case, M.H. asked the juvenile court to suppress all evidence that was obtained in violation of her Fourth Amendment rights. But M.H. did not specify what evidence she sought to suppress. And a review of the record shows that no evidence was obtained as a result of her arrest. M.H. simply sought to defend the charges against her and justify her conduct. Thus, M.H. essentially argued for a determination of the general issue—i.e., that she established the affirmative defense of an officer's use of excessive force.[2]

{¶11} The sufficiency of an affirmative defense cannot properly be established through a pretrial motion. *See State v. Carnes*, 2016-Ohio-8019, 75 N.E.3d 774, ¶ 4 (1st Dist.), *aff'd*, 154 Ohio St.3d 527, 2018-Ohio-3256, 116 N.E.3d 138 (holding that the sufficiency of the state's evidence is a "general issue" to be determined at trial); *State v. Graham*, 9th Dist. Medina No. 16CA0028-M, 2016-Ohio-8503, ¶ 13 (holding that an essential element of the offense cannot be contested through a pretrial motion). Instead, "the issue must be presented in a motion for

---

[2] M.H.'s motion to suppress focused solely on the excessive-force issue. On appeal, M.H. argues for the first time that the state failed to establish probable cause to support her arrest.

acquittal at the close of the state's case." *State v. Hoskins*, 1st Dist. Hamilton No. C-090710, 2010-Ohio-2454, ¶ 11.

{¶12} We accordingly conclude that the juvenile court did not err in denying M.H.'s motion to suppress. M.H.'s first assignment of error is overruled.

### III. *Sufficiency and Weight of the Evidence*

{¶13} In her second and fourth assignments of error, M.H. challenges the sufficiency and weight of the evidence supporting her adjudications for obstruction of official business, resisting arrest, and assault on a peace officer.

{¶14} A sufficiency-of-the-evidence argument challenges the adequacy of the evidence on each element of the offense. In reviewing a sufficiency challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 274, 574 N.E.2d 492 (1991).

{¶15} A manifest-weight-of-the-evidence argument challenges the believability of the evidence. In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Id.*

#### A. Obstruction of Official Business

{¶16} M.H. was adjudicated delinquent for obstruction of official business in violation of R.C. 2921.31(A), which states: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that

6

hampers or impedes a public official in the performance of the public official's lawful duties."

{¶17} To support an adjudication for obstructing official business, the state must prove that M.H. "(1) performed an act; (2) without privilege; (3) with purpose to prevent, obstruct, or delay the performance of a public official of any authorized act within the public official's official capacity; and (4) that hampered or impeded the performance of the public official's duties." *In re Payne*, 1st Dist. Hamilton No. C-040705, 2005-Ohio-4849, ¶ 11. M.H. challenges all of the elements, arguing that she did not engage in any affirmative act intended to prevent, obstruct, or delay the officers and that did in fact hamper or impede them in the performance of their duties.

{¶18} "The proper focus in a prosecution for obstructing official business is on the defendant's conduct, verbal or physical, and its effect on the public official's ability to perform the official's lawful duties." *State v. Wellman*, 173 Ohio App.3d 494, 2007-Ohio-2953, 879 N.E.2d 215, ¶ 12 (1st Dist). "Where the overall pattern of behavior is one of resistance, * * * officers may consider the totality of the events and need not point to a single act that rises to the level of obstruction." *Lyons v. Xenia*, 417 F.3d 565, 574 (6th Cir.2005), citing *Warren v. Lucas*, 11th Dist. Trumbull No. 99-T-0019, 2000 WL 655446 (May 19, 2000), and *State v. Overholt*, 9th Dist. Medina No. 2905-M, 1999 WL 635717 (Aug. 18, 1999).

{¶19} *Phillips v. Blair*, 786 Fed.Appx. 519 (6th Cir.2019), presents a similar factual situation to this case.[3] In *Phillips*, a caller reported that three individuals were burglarizing a shuttered bar and noted a description of the individuals. *Id.* at

---

[3] *Phillips* involved an appeal of the denial of qualified immunity in an action brought under 42 U.S.C. 1983.

522. The arresting officer was less than a block away when she heard the dispatch and responded to the scene. *Id.* The officer observed the suspect's truck parked outside of the shuttered bar and initiated an investigatory stop. *Id.* After the suspect was detained, other officers began responding to the scene. *Id.* at 522-523. One of the responding officers helped remove the suspect from the vehicle to question him. *Id.* at 523. The responding officer grabbed the suspect's arm and the suspect "tensed up" and attempted to reenter the truck. *Id.* The suspect proceeded to struggle with the officers for several moments and was eventually subdued with several police techniques—e.g., a takedown maneuver, handcuffs, and mace. *Id.* The officers subsequently arrested the suspect for obstructing their investigation of the alleged burglary. *Id.*

{¶20} On appeal, the Sixth Circuit concluded that the suspect's interference with the investigation rose to the level of obstructing official business. The court determined that the struggle between the suspect and the officers painted "an overall picture of resistance rather than cooperation." *Id.* at 528. The court found that the suspect recoiled from the responding officer's touch, continued gripping the door handle of his truck, and proceeded to struggle with the officers for several moments. *Id.* The struggle ultimately required at least three officers to pull the suspect away from the truck. *Id.* The court further found that the suspect "undoubtedly" distracted the officers from investigating the burglary (which had actually been committed by another individual). *Id.* Under these circumstances, the court concluded that "the physical struggle constituted an affirmative act supporting a lawful arrest for obstruction." *Id.*

{¶21} Ohio courts have similarly held that moving away from and physically resisting officers is sufficient to support a conviction for obstructing official business.

*See, e.g., State v. Merz*, 12th Dist. Butler No. CA97–05–108, 2000 WL 1051837 (July 31, 2000); *State v. Florence*, 12th Dist. Butler No. CA2013–08–148, 2014-Ohio-2337; *State v. Shepherd*, 5th Dist. Richland No. 14CA63, 2015-Ohio-4330.

{¶22} While this is admittedly a close case, in viewing the evidence in the light most favorable to the prosecution, we find that much like the suspect in *Phillips*, M.H.'s "overall pattern of behavior [was] one of resistance." *See Lyons,* 417 F.3d at 574. M.H. exhibited "hostility and unwillingness to cooperate in physical and verbal ways." *See id.* Rubariu twice ordered M.H. to "come here" before she stopped. It was clear from the body-camera video that M.H. had an argumentative demeanor. M.H.'s behavior escalated when Rubariu grabbed her arm. M.H. physically resisted the officers, pulling her arm away from Rubariu and twisting her body to break free from his grip. After Rubariu preformed a takedown maneuver, M.H. continued to struggle for several minutes. It took at least two officers to handcuff her and at least three officers to get her to the patrol vehicle. M.H.'s actions entirely stalled the officers' investigation into the original complaint—i.e., the alleged assault at the Family Dollar. Accordingly, we find there was sufficient evidence to support M.H.'s adjudication for obstructing official business.

{¶23} We likewise find that the adjudication was supported by the manifest weight of the evidence. M.H. largely reiterates her arguments under the sufficiency challenges. She contends that the manifest weight of the evidence does not support an adjudication for obstructing official business because she cooperated with Rubariu prior to being detained. However, as described above, there was sufficient evidence in the record to support the court's determination that M.H. purposefully delayed, prevented, or obstructed the officers from investigating the incident at the

Family Dollar. Therefore, we find that M.H.'s adjudication for obstructing official business is not against the manifest weight of the evidence.

## B. Resisting Arrest

{¶24} M.H. was adjudicated delinquent for resisting arrest in violation of R.C. 2921.33(A), which states: "No person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another." M.H. argues that she was not in fact under arrest, or if she was under arrest, that she was not lawfully under arrest.

{¶25} A "lawful arrest" is an element of resisting arrest, and the prosecution must prove beyond a reasonable doubt that the arrest allegedly resisted was lawful. *State v. Raines*, 124 Ohio App.3d 430, 432, 706 N.E.2d 414 (1st Dist.1997). "To be a lawful arrest, the arresting officer must have probable cause or a reasonable basis to believe that the offense for which the defendant has been arrested did, in fact, occur." *State v. Glenn*, 1st Dist. Hamilton No. C-030356, 2004-Ohio-1489, ¶ 23.

{¶26} At trial, Officer Higgins testified as one of the arresting officers. Higgins testified that they received a dispatch for "physical trouble with a customer" at the Family Dollar. The customer was described as "a female black wearing a white coat and a red hat." Higgins testified that minutes after the dispatch, he saw M.H. walking with two other individuals approximately one block away from the Family Dollar. According to Higgins, M.H. matched the description of the alleged assailant. Under these circumstances, there was probable cause to believe that M.H. committed assault at the Family Dollar. *See State v. Bass*, 2d Dist. Greene No. 2011-CA-01, 2012-Ohio-3275, ¶ 9, citing *State v. Marshall*, 8th Dist. Cuyahoga No. 39590, 1979 WL 210519, *4 (Nov. 15, 1979) ("Probable cause to arrest may exist * * * where a person matching the suspect's description is found in close proximity to the scene of the crime."). Therefore, the arresting officers were authorized by law to arrest M.H.

{¶27} The next question is whether an arrest actually occurred. An arrest occurs when the following circumstances are present: "(1) An intent to arrest, (2) under a real or pretended authority, (3) accompanied by an actual or constructive seizure or detention of the person, and (4) which is so understood by the person arrested." (Internal quotations omitted.) *State v. Carroll*, 162 Ohio App.3d 672, 2005-Ohio-4048, 834 N.E.2d 843, ¶ 8 (1st Dist.). Thus, the evidence must show that the defendant should have reasonably understood that she was being detained. *Id.*; *In re S.C.W.*, 9th Dist. Summit No. 25421, 2011-Ohio-3193, ¶ 28. A child's age is an important consideration when determining whether the child understood that she was being placed under arrest. *In re S.C.W.* at ¶ 19 and 30.

{¶28} M.H. argues that there was insufficient evidence of her understanding that she was being placed under arrest.

{¶29} We agree that it is unclear exactly when the investigatory stop transcended into a formal arrest. But we are not confined to any specific point in time when evaluating M.H.'s actions. A review of the record shows that an entire course of conduct occurred between M.H. and Rubariu. Therefore, we consider whether at any time during that course of conduct, M.H. reasonably understood that she was being detained and nonetheless continued to resist.

{¶30} The entirety of the incident lasted more than six minutes. During that time, two uniformed officers exited from a marked patrol vehicle with the overhead lights activated and immediately engaged with the three girls. One of the uniformed officers, Rubariu, ordered M.H. to stop walking and "come back" to the patrol vehicle. Rubariu then grabbed M.H.'s wrist and she pulled away. Rubariu preformed a balance-displacement maneuver, knocking M.H. chest first onto the ground. Rubariu laid on top of M.H. and attempted to handcuff her. While on the

ground, M.H. stated "I didn't do nothin' " and expressed confusion as to what she was being "arrest[ed] for." Nonetheless, M.H. continued to hide her hands and kick her legs.

**{¶31}** One minute into the encounter, Rubariu put out an assistance call and at least two more uniformed officers arrived in marked patrol vehicles. One of the uniformed officers, Baird, helped carry M.H. to the backseat of a patrol vehicle. Another one of the uniformed officers, Fath, helped restrain M.H. with a hobble. The entire time M.H. kicked towards the officers, despite their instructions to stop.

**{¶32}** None of the officers ever told M.H. the nature of the stop or that she was under arrest. However, in taking M.H. to the ground, handcuffing her, carrying her to the backseat of a marked patrol vehicle, and restraining her legs with a hobble, it is clear that the officers engaged in a course of conduct for which an arrest was the obvious and inevitable outcome. *See State v. Maurer*, 15 Ohio St.3d 239, 255, 473 N.E.2d 768 (1984) ("The magic words 'you are under arrest' are not necessary to constitute an arrest."). M.H. even acknowledged that she was under "arrest" approximately two and a half minutes into the encounter. Under these circumstances, there was sufficient evidence that M.H. knowingly resisted a lawful arrest.

**{¶33}** There being sufficient evidence to support the adjudication for resisting arrest, we next consider whether the adjudication was against the manifest weight of the evidence.

**{¶34}** M.H. contends that her adjudication was against the manifest weight of the evidence because she proved an affirmative defense of excessive force.

**{¶35}** This court recognizes that an officer's use of excessive force is an affirmative defense to resisting arrest. *See State v. Barnes*, 1st Dist. Hamilton No. C-

12

170355, 2018-Ohio-3894, ¶ 11. An arresting officer's use of force is analyzed under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The reasonableness of an officer's use of force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

{¶36} The heart of M.H.'s argument is that, given the minor nature of the crime for which she was suspected, the force Rubariu used was unreasonable.

{¶37} M.H. was suspected of committing a misdemeanor assault, a violent but not severe crime. M.H. posed little to no threat to the safety of the arresting officers. At the time of the offense, M.H. was 16 years old and significantly smaller than the officers. There is also no evidence that M.H. possessed a weapon.

{¶38} Of significant importance to this case, however, is that M.H. actively resisted arrest. M.H.'s resistance started immediately from the outset and continued throughout the entire period she was being taken into custody. M.H. refused Rubariu's orders to return to the patrol vehicle and attempted to break free once Rubariu grabbed her wrist. Rubariu subdued M.H. with a takedown maneuver and M.H. immediately nestled her arms under her body. M.H. also kicked her legs towards the arresting officers, making contact with at least two of the officers. Throughout the entire six-minute encounter, M.H. continuously interfered with the officers' ability to place her under arrest.

{¶39} A review of the record shows that Rubariu's use of force escalated alongside M.H.'s resistance and resulted in no injuries. None of the witnesses at trial opined that Rubariu used excessive force. And none of the witnesses testified that

13

Rubariu's actions were inappropriate under the circumstances. Therefore, the juvenile court could have reasonably found that Rubariu did not use excessive force to detain M.H.

{¶40} After reviewing the record in this case, we do not find that the juvenile court clearly lost its way and created such a manifest injustice that M.H.'s adjudication for resisting arrest must be reversed.

C. Assault on a Peace Officer

{¶41} M.H. was adjudicated delinquent for assault on a peace officer in violation of R.C. 2903.13(A) and 2903.13(C)(5). R.C. 2903.13(A) provides: "No person shall knowingly cause or attempt to cause physical harm to another[.]" R.C. 2303.13(C)(5) enhances the offense to a fourth-degree felony "[i]f the victim of the offense is a peace officer * * * while in the performance of their official duties[.]"

{¶42} M.H. argues that the evidence was insufficient to prove that she "knowingly" attempted to cause harm to Officers Higgins and Baird. M.H. contends that she was indiscriminately flailing her legs without the requisite intent.

{¶43} A person acts "knowingly" when she "is aware that [her] conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Thus, the state was not required to prove that M.H. specifically intended to kick Higgins and Baird. Instead, the state was required to prove that M.H. was aware that flailing her legs would probably cause harm to the officers.

{¶44} "Incidental and accidental conduct cannot support a conviction for knowingly causing or attempting to cause physical harm." *In re S.C.W.*, 9th Dist. Summit No. 25421, 2011-Ohio-3193, ¶ 23. However, several Ohio courts have found that "flailing" to evade arrest is sufficient to support a conviction for knowingly causing harm or attempting to cause harm. *See, e.g., State v. Munoz*, 10th Dist.

14

Franklin No. 12AP-299, 2013-Ohio-4987, ¶ 12 ("When flailing one's arms while in close proximity to another, it is probable that one will strike the other."); *State v. Standifer*, 12th Dist. Warren No. CA2011-07-071, 2012-Ohio-3132 (evidence that officer was kicked by defendant's flailing foot during arrest was sufficient to support assault conviction); *State v. Noble*, 9th Dist. Lorain No. 94CA005862, 1995 WL 366069 (June 21, 1995) (evidence that officer was struck by defendant's flailing arms and legs during arrest was sufficient to support assault conviction).

{¶45} In this case, three officers carried M.H. to the patrol vehicle—Rubariu holding her hands, Baird holding her arm and shoulder, and Higgins holding her ankles. As she was being carried, M.H. began kicking her legs backwards. Upon contact, Higgins immediately yelled, "Hey! Hey! Don't kick! What are you thinking?" As she continued, Higgins again ordered her to stop. Nonetheless, M.H. kept kicking as the officers forced her into the patrol vehicle. One of the officers warned, "If you injure one of us * * * ." The officers then decided to restrain M.H. through the use of a hobble. As the officers were placing the hobble on M.H., she kicked Baird in the arm and displaced his body-worn camera. Under these circumstances, there was sufficient evidence that M.H. was aware her actions would probably cause harm to the officers.

{¶46} M.H. also argues that the evidence was insufficient to prove that she physically harmed Higgins and Baird. However, the state was not required to prove that M.H. actually caused physical harm to the officers. *See State v. Hudson*, 1st Dist. Hamilton No. C-170681, 2019-Ohio-3497, ¶ 9; *In re A.F.*, 1st Dist. Hamilton No. C-190680, 2020-Ohio-5420, ¶ 14. Instead, the state was required to prove that M.H. caused or "attempt[ed] to cause" harm to the officers. R.C. 2903.13(A).

15

{¶47} Evidence that M.H. kicked Higgins in the groin and kicked Baird in the arm is sufficient evidence of attempted harm. "The fact that there was no actual physical harm is irrelevant for a finding of guilt under R.C. 2903.13(A)." *Hudson* at ¶ 9.

{¶48} In as much as we find that there was sufficient evidence to support the adjudications for assault on a peace officer, we likewise find that the adjudications were supported by the weight of the evidence. As noted above, M.H.'s only argument is that she did not "knowingly" cause harm to the officers. However, the juvenile court could have reasonably inferred that M.H. was aware that kicking her legs in the direction of the officers would probably cause harm to the officers. After reviewing the record in this case, we do not find that the juvenile court clearly lost its way and created such a manifest injustice that M.H.'s adjudications for assault on a peace officer must be reversed.

{¶49} M.H.'s second and fourth assignments of error are overruled.

### IV. Evidentiary Issues

{¶50} In her third assignment of error, M.H. alleges several evidentiary errors violated her rights to due process and a fair trial. M.H.'s arguments center around three pieces of evidence: Officer Rubariu's communications on the admitted body-worn cameras, Officer Rubariu's personnel file, including his suspension from the Mount Healthy Police Department, and the Mount Healthy Police Department's use-of-force policy.

{¶51} The trial court is vested with the sound discretion to rule on the admission or exclusion of evidence, and those rulings will not be overturned absent an abuse of discretion. *Renfro v. Black*, 52 Ohio St.3d 27, 33, 556 N.E.2d 150 (1990).

## A. Confrontation Clause

**{¶52}** M.H. first argues that her Confrontation Clause rights were violated by the juvenile court's admission of body-camera footage containing out-of-court communications by Rubariu.

**{¶53}** The Confrontation Clause preserves the right of a criminal defendant "to be confronted with the witnesses against him." Sixth Amendment to the U.S. Constitution. Thus, the Confrontation Clause prohibits "testimonial statements" of a witness who did not appear at trial. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), paragraph (a) of the syllabus. In determining whether a statement is "testimonial," the key inquiry is "whether, in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." *Ohio v. Clark*, 576 U.S. 237, 245, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015). "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.*

**{¶54}** In this case, the juvenile court allowed the state to introduce evidence of Rubariu's communications to M.H. Higgins testified that Rubariu twice ordered M.H. to "come here," and the video footage shows that Rubariu twice ordered M.H. to "come back here." The primary purpose of these commands was to control the situation and detain M.H., not to create an out-of-court substitute for trial testimony. Therefore, Rubariu's commands were not "testimonial statements" that implicated the Confrontation Clause.

## B. Hearsay

**{¶55}** M.H. next argues that Rubariu's directives were inadmissible under Evid.R. 802.

{¶56} Evid.R. 802 bars the admission of hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Evid.R. 801(C). For hearsay purposes, a "statement" is any oral, written, or nonverbal assertion. Evid.R. 801(A). An "assertion" means "to say that something is so, e.g., that an event happened or that a condition existed." (Internal quotations omitted.) *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 61. Questions, warnings, and directives are not assertions, and therefore not statements, because they are incapable of being proven either true or false. *State v. Young,* 8th Dist. Cuyahoga No. 78058, 2001 WL 370460, *5 (May 16, 2001). *See, e.g., State v. Spradlin*, 12th Dist. Clermont No. CA2016-05-026, 2017-Ohio-630, ¶ 30 (yelling for help not an assertion); *State v. West*, 10th Dist. Franklin No. 06AP-114, 2006-Ohio-5095, ¶ 8 (telling defendant to "stop" not an assertion).

{¶57} As described above, the expressions challenged by M.H. were directives—Rubariu ordered M.H. to "come back here." Because Rubariu's directives cannot be proven true or false, they are not assertive in nature. Therefore, such communications were not "statements" for the purposes of Evid.R. 801. Accordingly, the trial court did not abuse its discretion in admitting Rubariu's directives into evidence.

### C. Impeachment of Officer Rubariu

{¶58} M.H. also argues that the juvenile court abused its discretion by limiting her cross-examination of the state's witnesses regarding Rubariu's suspension from the Mount Healthy Police Department.

{¶59} The rules of evidence allow for the impeachment of any witness who testified at trial. *State v. Kline*, 11 Ohio App.3d 208, 211, 464 N.E.2d 159 (6th Dist.1983). The rules of evidence also allow for the impeachment of a hearsay

declarant. *See* Evid.R. 806 ("When a hearsay statement, * * * has been admitted in evidence, the credibility of the declarant may be attacked, * * * by any evidence that would be admissible for those purposes if the declarant had testified as a witness.").

{¶60} However, Rubariu was neither a witness nor a hearsay declarant. Rubariu did not testify at trial. And the juvenile court did not admit any out-of-court statements made by Rubariu. Thus, Rubariu was not subject to impeachment. Accordingly, the juvenile court did not err in limiting M.H.'s cross-examination of the state's witnesses.

### D. Relevancy of Use-of-Force Policy

{¶61} M.H. further argues that the juvenile court abused its discretion by finding that the Mount Healthy Police Department's use-of-force policy was irrelevant to her excessive-force defense. M.H. challenges both the juvenile court's grant of the state's motion to quash her subpoena and its inadmissibility ruling at trial.

{¶62} We first address M.H.'s argument that the juvenile court abused its discretion in granting the state's motion to quash. M.H. served the Mount Healthy Police Department with a subpoena duces tecum commanding the production of its use-of-force policy. In response, the state filed a motion to quash, arguing that the subpoena was an improper request for discovery and that the use-of-force policy was irrelevant to the case. Agreeing with the state, the juvenile court granted the motion to quash M.H.'s subpoena. However, a review of the record shows that M.H. had otherwise obtained the use-of-force policy. Therefore, any challenge to the juvenile court's ruling on the motion to quash is moot. *See, e.g., United States v. Louis Trauth Dairy, Inc.*, 162 F.R.D. 297, 300 (S.D.Ohio 1995) (holding a motion to quash

was moot where the defendant requested certain items that had already been provided through a previous release of documents).

**{¶63}** Having determined that M.H.'s first argument is moot, we turn now to M.H.'s second argument: whether the juvenile court abused its discretion in precluding evidence of the use-of-force policy at the suppression hearing and at trial.

**{¶64}** Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. In determining relevance, we must consider whether the evidence tends to prove any necessary element of an affirmative defense. *State v. Nemeth*, 82 Ohio St.3d 202, 207, 694 N.E.2d 1332 (1998).

**{¶65}** In this case, M.H. asserted an affirmative defense based on the alleged use of excessive force during her arrest. Claims of excessive force in the course of an arrest are analyzed under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "As in other Fourth Amendment contexts, * * * the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

**{¶66}** Case law regarding the relevancy of use-of-force policies is unsettled. Several courts have found that use-of-force policies are relevant to an excessive-force analysis. *See, e.g., United States v. Meyers,* 972 F.2d 1566, 1574 (11th Cir.1992) ("In determining whether a defendant in an excessive force case has acted 'reasonably,' it is proper to look to the existence of police regulations."); *Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir.1995) ("Although these police department guidelines do not

create a constitutional right, they are relevant to the analysis of constitutionally excessive force." (Internal citations omitted.)). *See also State v. Totty*, 2d Dist. Montgomery No. 23372, 2010-Ohio-1234; *State v. Fort*, 2016-Ohio-1242, 61 N.E.3d 864 (10th Dist.); *Shoultz v. State*, 735 N.E.2d 818 (Ind.App.2000).

{¶67} However, other courts have found that use-of-force policies are irrelevant to excessive-force claims. *See, e.g., Smith v. Freland*, 954 F.2d 343, 347 (6th Cir.1992) ("[T]he issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force."); *United States v. Brown*, 871 F.3d 532, 536-537 (7th Cir.2017) ("The excessive-force inquiry is governed by constitutional principles, not police-department regulations. An officer's compliance with or deviation from departmental policy doesn't determine whether he used excessive force."); *Woods v. Jefferson Cty. Fiscal Court*, W.D.Ky. No. 3:01CV–210–H, 2003 WL 145213, *4 (Jan. 8, 2003) ("In evaluating whether an officer's use of force is constitutional under *Graham*, the issue is whether it was objectively reasonable under all of the circumstances confronting the officer, not whether the officer violated a city or departmental policy. Whether an officer followed or violated police department policy and guidelines is not relevant under *Graham*."); *Mace ex rel. Revill v. City of Palestine*, 213 F.Supp.2d 691, 697 (E.D.Tex.2002) ("[T]he question before the Court is not whether [the officer] violated department policy. The only inquiry the Court must make is whether [the officer's] use of deadly force was objectively reasonable under the circumstances he confronted.").

{¶68} Notwithstanding the unsettled case law, M.H. failed to show how the Mount Healthy Police Department's use-of-force policy was relevant to her particular case. M.H. did not explain how the policy made it any more or less likely that Rubariu used excessive force. The primary issue in this case was whether Rubariu's

conduct was objectively unreasonable. However, M.H. did not proffer whether the policy was consistent with constitutional standards or whether Rubariu violated the policy. Based on the unsettled case law and the record in this case, we cannot conclude that the juvenile court abused its discretion in excluding evidence of the Mount Healthy Police Department's use-of-force policy.

### E. Cumulative Error

{¶69} Finally, M.H. argues that the cumulative effect of the evidentiary errors deprived her of a fair trial.

{¶70} The doctrine of cumulative error allows a conviction to be reversed if the cumulative effect of errors, deemed separately harmless, deprived the defendant of his right to a fair trial. *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. However, the cumulative-error doctrine is inapplicable where there are not multiple instances of harmless error. *State v. Leach*, 150 Ohio App.3d 567, 2002-Ohio-6654, 782 N.E.2d 631 (1st Dist).

{¶71} After reviewing the record and finding no instances of harmless error, we cannot find cumulative error. Accordingly, M.H.'s third assignment of error is overruled.

## V. Conclusion

{¶72} For the foregoing reasons, M.H.'s assignments of error are overruled and the judgments of the juvenile court are affirmed.

Judgments affirmed.

**BERGERON, P.J.,** and **WINKLER, J.,** concur.

Please note:
    The court has recorded its own entry on the date of the release of this opinion.